**FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

APR **2 7** 2022

**U. S. DISTRICT COURT**
**EASTERN DISTRICT OF MO**
**ST. LOUIS**

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
v.                             )      No. S1-4:20-cr-00098 HEA/JMB
                               )
ASIM MUHAMMAD ALI, M.D.,       )
STANLEY L. LIBRACH, M.D., and  )
SALLY M. HYDAR,                )
                               )
            Defendants.        )

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## BACKGROUND

### Defendants

1.      At all times relevant to this indictment, defendant Stanley L. Librach, M.D. ("Dr. Librach"), was a medical doctor, licensed to practice in the state of Missouri.   Since in or about February 2009, Dr. Librach has owned, operated, or been the medical director for one or more health care related businesses, including American Pain Institute, LLC ("API"); Institute for Pain Management, LLC ("IPM"); and Stanley Librach, M.D., D.D.S., LLC ("Librach, LLC").

2.      At all times relevant to this indictment, defendant Asim Muhammad Ali, M.D. ("Dr. Ali") has been a medical doctor, licensed in the state of Missouri.   Since in or about February 2011, Dr. Ali has owned, operated, or been the medical director for one or more health care related businesses, including IPM, AMA Physician Group, LLC, and Central Diagnostic Laboratory ("CDL").

3.      At all times relevant to this indictment, defendant Sally M. Hydar ("Hydar") was a resident of St. Louis County, Missouri.   At all times relevant to this indictment, Hydar was the office manager of Librach, LLC, a narcotic use disorder treatment clinic owned and operated by Dr. Librach.   At no time did Hydar have the license, registration or training to issue prescriptions for controlled substances.

4.      At all relevant times, Dr. Librach and Dr. Ali, either as individuals or through their businesses, were approved Medicare and Medicaid providers and submitted, or caused to be submitted, reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for services they purportedly provided, supervised, or ordered.

### Co-Conspirators

5.      At all times relevant to this indictment, co-conspirator Jerry Dale Leech, D.C. ("Dr. Leech") was a doctor of chiropractic medicine, licensed to practice in the state of Missouri. Dr. Leech has never been licensed as a medical doctor or otherwise authorized to practice as a medical doctor in the United States.   Since in or about April 2014, Dr. Leech has owned, operated, or managed one or more health care related businesses, including API, IPM, American Pain Clinic, Midwest Medical Marketing, LLC, and Institute for Regenerative Medicine, LLC.

6.      At all times relevant to this indictment, co-conspirator Denis J. Mikhlin ("Mikhlin") was a resident of St. Louis County, Missouri.   Since in or about June 2013, Mikhlin has owned and operated one or more health care related businesses, including Doctors on the Go, LLC; Doctors on the Go1, LC (jointly referred to as 'DOTG"); and D. Mikhlin Enterprises, LLC.

7.      At times relevant to this indictment, co-conspirator Alexis Dorjay Butler ("Butler") was a resident of St. Louis City, Missouri.

2

8.      At times relevant to this indictment, co-conspirator Shaunta C. Crosby ("Crosby") was a resident of St. Louis County, Missouri and was a recipient in the Missouri Medicaid Program ("Medicaid").

9.      At times relevant to this indictment, co-conspirator Erin Melissa Herman ("Herman") was a resident of St. Louis County, Missouri.

10.     At times relevant to this indictment, co-conspirator Vladimir Kogan ("Kogan") was a resident of St. Louis County, Missouri.

11.     At times relevant to this indictment, co-conspirator Ebony R. Price ("Price") was a resident of St. Louis City, Missouri and a Medicaid recipient.

12.     At times relevant to this indictment, co-conspirator Erica T. Spates ("E. Spates"), was a resident of St. Louis County, Missouri and a Medicaid recipient.

13.     At times relevant to this indictment, co-conspirator Tijuana A. Spates ("T. Spates") was a resident of St. Louis City, Missouri and a Medicaid recipient.

14.     At all relevant times, co-conspirators Dr. Leech and Mikhlin, either as individuals or through their businesses, were approved Medicare and Medicaid providers and submitted, or caused to be submitted, reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for services they purportedly provided, supervised, or ordered.

## Relevant Medicare Provisions

15.     The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled.   Medicare Part B reimburses health care providers for covered health services that they provide to Medicare beneficiaries in

3

outpatient settings.

16.   CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs" which are statutory agents for CMS for Medicare Part B.   The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries.   The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service. Wisconsin Physicians Service Insurance Corporation (WPS) is the Part B MAC for Eastern Missouri and thus processes reimbursement claims that Dr. Librach, Dr. Ali, CDL, API, IPM, Librach, LLC and DOTG submit to Medicare.

17.   To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement.   The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules.   After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

18.   Medicare providers must retain clinical records for the period required by state law or five years from date of discharge if there is no requirement in state law.

Defendant Dr. Librach's Enrollment in Medicare

19.   Between 2012 and 2016, defendant Dr. Librach completed and signed several Medicare enrollment applications.   He first applied in 2012 as an individual provider and later applied in March 2014 as the "MD managing owner" of API.   Contained in both applications was Section 14, entitled "Penalties for Falsifying Information," which informed Dr. Librach that he could be criminally prosecuted (a) for executing or attempting to execute a health care fraud

4

scheme or using false or fraudulent statements or representations to obtain money from a health

care benefit program or (b) making or using false or fraudulent statements or representations in

connection with the delivery or payment for health care benefits, items, or services.

   20. As part of the September 2012 and March 2014 applications, Dr. Librach signed

the "Certification Statement" of the application and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in
> the application.   I understand that any deliberate omission, misrepresentation, or
> falsification of any information . . . contained in any communication supplying
> information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . .
> including the Federal anti-kickback statute . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim
> for payment by Medicare, and will not submit claims with deliberate ignorance or
> reckless disregard of their truth or falsity.

Defendant Dr. Ali's Enrollment in Medicare

   21. Dr. Ali completed several Medicare provider enrollment applications, including

one in or about February 2015 as an individual and one in or about April 2016 in which he is

identified as the owner and medical director of IPM.   These applications contained the same

Section 14, "Penalties for Falsifying Information," and Section 15, "Certification Statement,"

described above.   Thus, Dr. Ali was given notice of the penalties for falsifying information to

Medicare and certified that he would comply with the laws, regulations, and policies applicable

to Medicare.

Co-Conspirators' Enrollment in Medicare

   22. Dr. Leech completed several Medicare provider enrollment applications,

including one in or about October 2013 as an individual provider and one in or about March

5

2014 as the "DC/Managing Owner" of API.   Both of these applications contained a section,

entitled "Penalties for Falsifying Information," and a "Certification Statement."   Thus,

Dr. Leech was given notice of the penalties for falsifying information to Medicare and certified

that he would comply with the laws, regulations, and policies applicable to Medicare.

23.     In or about August 2014, Mikhlin completed a Medicare provider enrollment

application for DOTG, which Mikhlin owned and incorporated in or about June 2014.   This

application contained the same Section 14, "Penalties for Falsifying Information," and Section

15, "Certification Statement" described above.   Thus, Mikhlin was given notice of the penalties

for falsifying information to Medicare and certified that he would comply with the laws,

regulations, and policies applicable to Medicare.

### Relevant Missouri Medicaid Provisions

24.     MO HealthNet administers the Missouri Medicaid Program, which is jointly

funded by the State of Missouri and the federal government.   Missouri Medicaid reimburses

health care providers for covered services rendered to low-income Medicaid recipients.

25.     A Medicaid provider must enter into a written agreement with MO HealthNet to

receive reimbursement for medical services to Medicaid recipients and must agree to abide by

MO HealthNet's regulations in rendering and billing for those services.

26.     On about September 4, 2004, May 9, 2016, December 20, 2013, and

February 20, 2015 respectively, defendants Dr. Librach and Dr. Ali, and co-conspirators Dr.

Leech and Mikhlin signed Missouri Medicaid provider agreements that contained the following

language:

6

By my signature below, I, the applying provider, read and agree that, upon the acceptance of my enrollment, I will participate in the Vendor Payment plan. I am responsible for all services provided and all billing done under my provider number regardless to whom the reimbursement is paid.   It is my legal responsibility to ensure that the proper billing code is used and indicate the length of time I actually spend providing services regardless to whom the reimbursement is paid.   I agree to be financially responsible for all services, which are not documented.   I agree the Missouri Title XIX Medicaid manual, bulletins, rules, regulations and amendments thereto shall govern and control my delivery of services and further agree to the following terms:

I agree that it is my responsibility to access manual materials that are available from DMS over the Internet.   I will comply with the Medicaid manual, bulletins, rules, and regulations as required by the Division of Medical Services and the United State Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment.   I understand that in my field of participation I am not entitled to Medicaid reimbursement if I fail to so comply, and that I can be terminated from the program for failure to comply.

27.    Medicaid providers must retain, for five years from the date of service, fiscal and medical records that reflect and fully document services billed to Medicaid and must furnish or make the records available for inspection or audit by the Missouri Department of Social Services or its representative upon request.   Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program.   This policy continues to apply in the event of the provider's discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

## Relevant Tricare Provisions

28.    Tricare is a federally funded program that reimburses for health care services provided to active, retired, reserve, guard, and uniformed service members and their families.

The Defense Health Agency ("DHA") is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries.   DHA exercises management responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare.

## Current Procedural Terminology (CPT) Codes

29.     In presenting reimbursement claims to health insurance companies, health care providers use numeric codes, known as "CPT Codes," to describe the services they provide. The CPT codes are contained in the Physicians Current Procedural Terminology manual.   The CPT manual is published by the American Medical Association (AMA) and its body of physicians of every specialty, who determine appropriate definitions for the codes.   By submitting claims using these CPT codes, providers represent to the insurance companies and their patients that the services described by the codes were in fact provided.

30.     Reimbursement rates for the CPT codes are set through a fee schedule, which establishes the maximum amount that the provider will be paid for a given service, as identified by the CPT code.

## Relevant Provisions Concerning Controlled Substances

31.     Certain prescription drugs are defined by federal and state law as controlled substances, which are drugs that have some potential for abuse or dependence.   Controlled substances are placed into one of five schedules, based on the potential for abuse and the severity of the effects if a person abuses the drug.   Of the controlled drugs that can legally be prescribed, Schedule II drugs have the highest potential for abuse because of the risks of severe psychological or physical dependence.   Oxycodone, oxycodone-acetaminophen, and fentanyl are Schedule II drugs.   Xanax is a Schedule IV drug and Lyrica is a Schedule V drug.

8

32.     Federal regulation, 21 CFR 1306.04(a), provides that:

a prescription drug for a controlled substance to be effective must be issued for a
legitimate medical purpose by an individual practitioner acting in the usual course
of his professional practice. The responsibility for the proper prescribing of a
controlled substances is upon the prescribing practitioner. . . . An order purporting
to be a prescription issued in the usual course of professional practice . . . is not a
prescription within the meaning of section 309 of the Act (21 U.S.C. 829) and the
person . . . issuing the [purported prescription] shall be subject to the penalties
provided for violations of the provision of law relating to controlled substances.

33.     The Missouri Board of Registration for the Healing Arts ("Board") licenses and

regulates medical doctors and certain other health care practitioners. The Board prohibits

medical doctors from signing a blank prescription form or otherwise prescribing a "drug,

controlled substance or other treatment" unless the doctor has established a physician-patient

relationship and conducted a sufficient examination of the patients. *See* R.S. Mo. 334.100(2)(4).

### Federal Anti-Kickback Statute

34.     Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b))

("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare

and Medicaid will not pay for services that are provided in violation of the AKS.

35.     The AKS makes it a criminal offense for any person to knowingly and willfully

solicit, offer, pay or receive remuneration in return for or to induce any person to refer,

recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in

whole or in part by any federally funded health care program. Both parties to such an

arrangement may be criminally liable if one purpose of the arrangement is to obtain

remuneration for the referral of services or to induce referrals.

36.     Remuneration is broadly defined as anything of value, including money, goods,

services, or the release or forgiveness of a financial obligation that the other party would

normally have to pay.   In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing or referring patients for health care services.

### Count 1
### Conspiracy
### 18 U.S.C. § 371

37.    Paragraphs 1 to 36 are incorporated by reference as if fully set out herein.

38.    Beginning in or about October 2013, and continuing to at least in or about March 2021, in the Eastern District of Missouri and elsewhere,

ASIM MUHAMMAD ALI, M.D.,
STANLEY L. LIBRACH, M.D., and
SALLY M. HYDAR,

the defendants herein, and persons known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly combine, conspire, and agree with persons known and unknown to the grand jury to commit the following offenses against the United States:

a.   to knowingly and intentionally prescribe a controlled substance outside the normal course of professional practice and for no legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1) and 843(a)(1);

b.   to acquire and obtain possession of controlled substances by misrepresentation, fraud, forgery, deception, and subterfuge, in violation of Title 21, United States Code, Section 843(a)(3);

c.   to defraud a health care benefit program and to obtain, by false and fraudulent representations, money owned by and under the control of a health care benefit program, in connection with the delivery and payment of health care

benefits, items, and services, in violation of Title 18, United States Code, Section 1347;

d.  to knowingly and willfully solicit, offer, pay, and receive any kickback, bribe, and rebate for referrals that are reimbursed in whole or part by a federal health care benefit program, in violation of Title 42, United States Code, Sections 1320a-7b(b)(2)(B) and 1320a-7b(b)(1)(B); and

e.  to knowingly transfer, possess, and use, without lawful authority, a means of identification of another person in connection with any unlawful activity that constitutes a violation of federal law or is a felony under state or local law, in violation of Title 18, United States Code, Section 1028(a)(7).

### Purpose of the Conspiracy

39.  The purpose of the conspiracy was for:

a.  doctors and unauthorized persons to accept cash for illegally writing prescriptions for controlled substances for individuals outside the usual course of medical practice and without a legitimate medical purpose;

b.  defendants and their co-conspirators to identify and recruit individuals who, in return for money or controlled substances, would permit their names to be used on fraudulent prescriptions, take the fraudulent prescriptions to pharmacies to be filled, and purchase and sell the controlled substances obtained through the fraudulent prescriptions; and

c.  defendants and their co-conspirators to solicit, offer, pay, and receive illegal kickbacks for specimens and prescriptions referred and sent to certain medical

11

testing laboratories and pharmacies.

### Manner and Means of the Conspiracy

40.    It was part of the conspiracy that Dr. Librach, Dr. Leech, Dr. Ali, and others incorporated and operated the medical practices and laboratories, identified below, and used these businesses as a means of committing the criminal offenses described in this indictment.

41.    It was part of the conspiracy that in or about February 2009, Dr. Librach established Librach, LLC, which primarily operated as a "Suboxone clinic." A Suboxone clinic is a medical practice that treats patients who have narcotic use disorders with the drug buprenorphine, also known as its brand-name equivalent "Suboxone." Dr. Librach was the owner of Librach, LLC, and Hydar was the office manager.

42.    It was part of the conspiracy that in or about February 2014, Dr. Librach and Dr. Leech incorporated and opened API, which described itself as a multilevel pain management clinic providing chiropractic, medical, and other health related services. In or about August 2014, in a Medicaid application, Dr. Leech identified himself as an 82% owner of API and Dr. Librach as an 18% owner of API. Dr. Librach was the medical director and supervised API nurse practitioners and Dr. Leech was the day-to-day manager of API.

43.    On or about March 15, 2016, Dr. Leech received a letter from WPS, notifying him that his and API's Medicare billing privileges were revoked. The revocation stemmed from a false statement Dr. Leech made on an earlier Medicare application.

44.    About two weeks after receiving the revocation letter, on or about April 1, 2016, Dr. Leech and Dr. Librach submitted another Medicare application for API. However, in this subsequent application, Dr. Leech was not listed as co-owner with Dr. Librach. Instead, in an

12

attempt to conceal Dr. Leech's involvement with API, Dr. Leech's mother was listed as a co-owner.   Medicare denied this application, which meant API could no longer bill Medicare for services.

45.   In the same month, April 2016, Dr. Ali and Dr. Leech's wife opened IPM and identified themselves as the owners.   In December 2017, Dr. Leech registered IPM in the state of Missouri and listed his mother as the organizer of IPM.   Dr. Leech identified himself as the "Chief of Staff" of IPM and similar to his role at API, exercised control over all aspects of IPM. At various times, IPM operated out of several locations, including Woodfield Lane, Old Tesson Ferry Road, and Grandview Plaza in St. Louis County.

46.   Dr. Ali served as the medical director of IPM from in or about April 2016 until he resigned in or about January 2018.   Then, Dr. Librach assumed the role of medical director for IPM.   While serving as medical directors, Dr. Ali and Dr. Librach were responsible for supervising the IPM nurse practitioners.

47.   API, IPM, and Librach, LLC employed medical assistants, advanced nurse practitioners, and/or chiropractors, none of whom were authorized under state or federal law to prescribe controlled substances.

Dr. Librach and Dr. Ali Pre-Signed Prescriptions for Controlled Substances

48.   It was part of the conspiracy that either Dr. Librach or Dr. Ali would typically be present at API, and later IPM, one day a week for about two hours.   Dr. Librach or Dr. Ali usually came to the clinic on Wednesdays or Fridays to pre-sign prescriptions to be given to patients on their next visit to the clinic.   Dr. Librach and Dr. Ali did not physically see, examine, or evaluate the patients on the dates they signed the prescriptions or the dates the patients

actually received the controlled substance prescriptions.

49.     On April 16, 2018, during an inspection, the Board of Narcotics and Dangerous Drugs ("BNDD") found 165 pre-dated controlled substance prescriptions, which Dr. Librach had signed.   These prescriptions were to be given to patients during visits scheduled between April 16, 2018 and April 20, 2018.   As previously stated, under federal and state law, medical doctors may not pre-sign and pre-date prescriptions for controlled substances.

50.     It was further part of the conspiracy that Dr. Librach and Dr. Ali pre-signed controlled substance prescriptions for patients, who over a period of months repeatedly tested negative for the prescribed controlled substances but tested positive for non-prescribed or illegal controlled substances.   The patients' medical records, to the extent they exist, do not indicate that Dr. Librach or Dr. Ali addressed the obvious diversion of the prescribed controlled substances.

51.     It was further part of the conspiracy that Dr. Librach, Dr. Ali, and Dr. Leech referred or caused IPM patients to be referred to Dr. Librach's drug addiction treatment program at Librach, LLC.   Dr. Librach also pre-signed controlled substance prescriptions for patients of Librach, LLC.   Dr. Librach did not examine or evaluate the patients on the dates he signed the prescriptions or on the dates the patients actually received the controlled substance prescriptions.

52.     It was further part of the conspiracy that Hydar, who had no DEA registration to prescribe controlled substances, improperly made medical decisions regarding patients' controlled substance prescriptions issued by Dr. Librach at Librach, LLC.   Dr. Librach was aware that Hydar made unilateral, unsupervised decisions regarding patients' prescriptions for controlled substances under his name, but made no independent medical judgment as to those

14

prescriptions and did not challenge or alter the medical decision-making that Hydar conducted with respect to the prescriptions for controlled substances.

Dr. Leech Distributed Illegal Controlled Substance Prescriptions

53.     It was further part of the conspiracy that Dr. Leech knew that Dr. Librach and Dr. Ali were pre-signing prescriptions for patients whom they did not see or evaluate, but Dr. Leech took no action to stop this illegal practice.

54.     It was further part of the conspiracy that Dr. Leech knew Mikhlin was creating or causing the creation of fraudulent controlled substance prescriptions for co-conspirator Erin Herman ("Herman").   In addition, when pharmacies called IPM regarding co-conspirator Herman's controlled substance prescriptions, it was Dr. Leech who approved early refills of the controlled substance prescriptions.

55.     It was further part of the conspiracy that Dr. Leech solicited and received money or other things of value from individuals in exchange for fraudulent prescriptions.   Dr. Leech knew the individuals did not have a doctor-patient relationship with the doctors he listed or caused to be listed on the fraudulent prescriptions.

56.     It was further part of the conspiracy that co-conspirator Tijuana Spates ("T. Spates"), accompanied at times by co-conspirator Alexis Butler, co-conspirator Ebony Price ("Price"), co-conspirator Erica Spates ("E. Spates"), and others met with Dr. Leech at IPM, usually two times a month. There, T. Spates would give Dr. Leech the names to be listed on the fraudulent controlled substance prescriptions and then wait for Dr. Leech to prepare the fraudulent prescriptions.

57.     It was further part of the conspiracy that Dr. Leech and Dr. Librach listed Dr.

15

Librach as the prescribing doctor on many of the fraudulent prescriptions, although they knew Dr. Librach had not seen nor examined the individuals listed as patients on the fraudulent prescriptions.

58.    It was further part of the conspiracy that T. Spates typically paid Dr. Leech between $200 and $500 for each prescription for controlled substances, including oxycodone and oxycontin prescriptions.   T. Spates paid Dr. Leech about $4,000 to $5,000 each time she received fraudulent prescriptions from him.

59.    It was further part of the conspiracy that co-conspirators T. Spates, E. Spates, Price, and others recruited or identified individuals to be listed as patients on the fraudulent prescriptions. In reality, Dr. Leech knew that these individuals were relatives, friends and acquaintances of the defendants and their co-conspirators, were not patients of Dr. Librach, and did not have a doctor-patient relationship with Dr. Librach.

60.    Prior to their names being used, some individuals listed on the fraudulent prescriptions reached an agreement with T. Spates, permitting her to use their names on the fraudulent prescriptions.   As payment, T. Spates gave these unindicted co-conspirators money or controlled substances obtained with the fraudulent prescriptions.   Other individuals did not know their names were used on the fraudulent prescriptions until after the prescriptions were filled. Once they discovered their names had been used, T. Spates paid some of these individuals to keep them from reporting the fraud.

61.    It was further part of the conspiracy that T. Spates, Price, E. Spates, and other co-conspirators had the fraudulent prescriptions filled at local pharmacies, including Walgreens and Shop 'n Save pharmacies.

16

62.    In some instances, pharmacies would call API or IPM to determine if a prescription was legitimate.   It was part of the conspiracy that Dr. Leech instructed the clinic staff to tell the pharmacies the prescriptions were legitimate, although he knew the prescriptions were fraudulent.

Mikhlin Distributed Illegal Controlled Substance Prescriptions

63.  It was part of the conspiracy that Mikhlin recruited individuals ("Recruits") to use fraudulent prescriptions to obtain controlled substances.   Very often, the fraudulent prescriptions were for oxycodone pills.   Mikhlin received the pills from the Recruits and paid them with pills, cash, or a combination of both.

64.    It was further part of the conspiracy that Mikhlin recruited co-conspirator Vladimir Kogan to collect money and pills from the Recruits.   Additionally, Kogan sold fraudulent prescriptions and he and Mikhlin shared the proceeds.

65.    It was further part of the conspiracy that Mikhlin recruited Herman and paid her for each fraudulent prescription that she filled.   Per the agreement, Herman's name was used on the fraudulent prescriptions, which she filled at local pharmacies as suggested by Mikhlin

66.    It was further part of the conspiracy that Mikhlin used the name of Doctor #1 on fraudulent prescriptions even though Doctor #1 had no knowledge that his/her name was being used on the fraudulent prescriptions and Doctor #1 was no longer providing services to DOTG patients.

67.    Co-conspirator Shaunta Crosby worked for Mikhlin at DOTG from in or about December 2017 to in or about June 2018.   It was part of the conspiracy that Crosby told pharmacies, calling for verification of prescriptions, that the fraudulent prescriptions were valid

and legitimate.

68.     During an extended period in 2018 when Mikhlin was away from DOTG, Mikhlin left Crosby in charge of DOTG.   Mikhlin told Crosby to give numerous fraudulent prescriptions bearing the name of Doctor #1.   After Kogan sold the prescriptions, he then was to give Crosby the money he received for the fraudulent prescriptions.

69.     It was further part of the conspiracy that Crosby prepared fraudulent prescriptions and obtained controlled substances for herself.

Dr. Ali Paid Mikhlin Illegal Kickbacks in Return for Referrals from IPM

70.     In or about June 2013, Mikhlin incorporated and opened D. Mikhlin Enterprises, LLC ("Mikhlin Enterprises").   Mikhlin Enterprises was a marketing company located in St. Louis, Missouri, which, among other things, referred urine specimens to medical testing laboratories.

71.     In or about August 2015, Dr. Ali incorporated and opened Central Diagnostic Laboratory ("CDL"), a medical laboratory located in St. Louis County, Missouri.   Dr. Ali and two other persons jointly owned CDL, which, among other services, performed urine drug tests. In or about January 2016, Dr. Ali and other co-conspirators completed an application for CDL to participate in the Medicare Program.   The application was approved and CDL became a Medicare provider.

72.     It was part of the conspiracy that Dr. Ali, Mikhlin, Dr. Leech, and other co-conspirators agreed that CDL would pay Mikhlin Enterprises for each urine specimen that IPM and API sent to CDL.   By so doing, Dr. Ali sought to benefit financially from having urine tests performed at CDL for the same patients for whom he had over-prescribed controlled substances.

Importantly, Dr. Ali did not use the results of the urine drug screens to inform or guide his treatment of the patients.

73.    It was further part of the conspiracy that on or about August 6, 2016, CDL wrote check #2617 to Mikhlin Enterprises for $8,260.00.   The memo line of the check states:   "Thank you!   July marketing fees – 236 samples."   CDL and Dr. Ali paid Mikhlin $35.00 for each sample he sent or caused to be sent to CDL in July 2016.

Dr. Ali Paid Dr. Leech Illegal Kickbacks in Return for Referrals from Dr. Librach and Others

74.    On or about February 23, 2016, Dr. Leech incorporated and opened Midwest Medical Marketing, LLC ("Midwest Marketing") in St. Louis, Missouri.   Midwest Marketing was a marketing company, which referred urine specimens to CDL and other labs.   It was part of the conspiracy that Dr. Ali, Dr. Leech, and Dr. Librach agreed that CDL would pay Midwest Marketing for each urine specimen that Dr. Librach and other un-indicted co-conspirators referred or sent to CDL.

75.    It was further part of the conspiracy that on or about April 30, 2017, CDL wrote check #3065 to Midwest Marketing for $7,840.00.   The memo line of the check states:   "April mkting fees" with the number 211 over 13, indicating that Midwest Marketing sent CDL 224 specimens for testing and CDL paid $35.00 for each of the 224 specimens it received from Midwest Marketing.

Dr. Librach and Hydar Received Illegal Kickbacks for Referrals to CDL and Other Labs

76.    It was further part of the conspiracy that Dr. Ali and Dr. Librach agreed that CDL would pay Hydar, with whom Dr. Librach had a personal relationship, $1,200.00 a month to induce Dr. Librach to refer specimens to CDL.   Dr. Librach deposited the checks Hydar

19

received from CDL into a bank account solely owned and controlled by him.

77.   It was further part of the conspiracy that Hydar negotiated with several other labs to refer urine specimens from Librach, LLC in exchange for illegal kickbacks in the form of paying Librach, LLC employees' wages, including Hydar's own wages.   Hydar generally would send Librach, LLC's specimens to the highest bidder.   Though Hydar was paid by labs, she did not collect urine specimens or otherwise provide compensable services to those labs.   Hydar was aware that many of those labs submitted claims to federal health care programs for reimbursement of the testing conducted on the specimens that Librach, LLC referred to them.

78.   It was further part of the conspiracy that Hydar informed Librach, LLC employees of quotas regarding the number of urine specimens that needed to be sent to each lab to justify the labs' payment of Librach, LLC employees' wages.

79.   It was further part of the conspiracy that Hydar required Librach, LLC patients to provide urine specimens as often as possible in order to send more samples to the labs and thus maximize her and Dr. Librach's receipt of illegal kickbacks.   On at least one occasion, Hydar falsified a patient's urine drug screen result to make the patient appear noncompliant with the patient's Suboxone treatment plan in order to justify billing Medicare for additional lab tests and visits than otherwise would have been necessary had the patient been compliant.

80.   It was part of the conspiracy that Dr. Librach received kickbacks in return for prescriptions sent to a pharmacy, owned by unindicted Co-conspirator #2.

## Overt Acts

81.   In furtherance of the conspiracy and to affect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri:

20

a.  On or about August 22, 2016, Price caused a prescription (#18691) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at Olive Street Pharmacy.   The prescription listed the patient as D.P. and listed Dr. Librach as the prescribing doctor.

b.  On or about December 30, 2016, Dr. Ali wrote check #2443 from CDL's bank account to D. Mikhlin Ent for $12,915.00.

c.  On or about January 29, 2017, T. Spates sent the following text to Price: "She said you gone have to wait until she cash in the other script she gone keep those."

d.  On or about February 28, 2017, Herman caused two prescriptions, one (#42061) for oxycodone Hcl 30mg, 90 count tablets, and one (#42062) for phentermine 37.5 mg, 30 count tablets, to be filled at Olive Street Pharmacy.

e.  On or about May 26, 2017, an individual authorized by CDL wrote CDL check #3116 to Dr. Librach's employee for $1,200.00.

f.  On or about May 30, 2017, Dr. Librach deposited check #3116 from CDL into his Bank of America bank account.

g.  On or about September 12, 2017, T. Spates sent a text message to Price.   In the text message was a notice from Walgreens concerning a delay in a prescription for Patient T.A.

h.  On or about November 22, 2017, Hydar sent the following text message to Dr. Leech and Dr. Librach: "I was told yall are under the impression that we sent a bunch of Illinois Mcd to central.   That is not true.   We sent ALL our MCR

& MO MCD to central.   ALL our 1st federal visits go to central tho-then...
[Employee P] would switch the Illinois MCD to... [Laboratory C].   He failed
to do that last mo so central got sum Illinois Medicaid in addition to all the mo
mcd & mcr... [Laboratory C] ONLY received Illinois Medicaid.   Central got
over 200 MO MCD & MCR ;).”

i.    On or about January 5, 2018, Dr. Ali wrote check #3551 for $10,000.00 to
Midwest Marketing.   The check was drawn on CDL's bank account.

j.    On or about January 12, 2018, defendant Dr. Ali pre-signed a controlled
substance prescription for Patient K.H.

k.    On or about March 8, 2018, at the direction of Mikhlin, Kogan provided a
fraudulent oxycodone prescription to un-indicted co-conspirator #1.   Un-
indicted co-conspirator #1 agreed to fill the fraudulent prescription for Kogan
in exchange for cash.

l.    On or about April 4, 2018, Dr. Leech authorized Olive Street Pharmacy in
St. Louis County, Missouri, to refill a fraudulent prescription, which listed
Herman as the patient and Dr. Librach as the prescribing physician.

m.    On or about April 6, 2018, Herman picked up a prescription for phentermine
37.5 mg, 30 tablets, knowing the prescription was fraudulent.

n.    On or about May 14, 2018, Crosby filled a fraudulent prescription at a
Walgreens pharmacy in Ferguson.   The prescription listed Dr. Librach as the
prescribing doctor and listed the patient as J.F.

o.    On or about June 12, 2018, Crosby attempted to fill a fraudulent prescription

22

at a Walgreens pharmacy in Hazelwood.   The prescription listed Doctor #1 as

the prescribing doctor and listed the patient as J.F.

    p.   On or about July 5, 2018, at the direction of Mikhlin and Crosby, Kogan

provided a fraudulent oxycodone prescription to un-indicted co-conspirator

#1.   Un-indicted co-conspirator #1 agreed to fill the fraudulent prescription

for Kogan in exchange for cash.

    q.   On or about July 9, 2018, Kogan obtained oxycodone pills from un-indicted

co-conspirator #1, sold them to un-indicted co-conspirator #2, and returned

approximately $950 to Crosby.

    r.   On or about July 6, 2018, Crosby drove unindicted co-conspirator

#3 to Walgreens pharmacy where he/she tried to fill a fraudulent prescription.

The prescription listed Doctor #1 as the prescribing doctor and listed the

patient as J.L.

All in violation of Title 18, United States Code, Section 371.

### Counts 2-10
### Illegally Prescribing Controlled Substances
### 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2

82.    Paragraphs 1 to 36 and 40 to 81 are incorporated by reference as if fully set out

herein.

Patient M.T.

83.    From in or about December 2015, to in or about April 2018, Dr. Librach wrote

over 20 controlled substance prescriptions for Patient M.T., but according to M.T.'s medical

chart Dr. Librach rarely saw M.T.   While under Dr. Librach's care, M.T. tested positive for

illicit drugs and/or non-prescribed controlled substances on multiple occasions.   On several occasions, M.T. tested negative for the drugs prescribed by Dr. Librach.   Despite knowing about M.T.'s inconsistent drug test results, Dr. Librach continued to write controlled substance prescriptions for M.T.

84.   From in or about December 2016, to in or about January 2018, Dr. Ali wrote over 20 controlled substance prescriptions for M.T.   According to M.T.'s medical chart, Dr. Ali rarely saw M.T., with Dr. Ali's first visit with M.T. occurring almost a year after he took over M.T.'s care.   According to M.T.'s medical chart, M.T. tested positive for illicit drugs while receiving prescriptions for controlled substances from Dr. Ali.   Despite knowing M.T. tested positive for illicit drugs, Dr. Ali continued to write controlled substance prescriptions for M.T.

Patient B.R.

85.   From in or about May 2015, to in or about October 2016, Dr. Librach wrote over 60 controlled substance prescriptions for Patient B.R., but according to B.R.'s medical record, Dr. Librach rarely if ever met B.R.   During this period, on multiple occasions, B.R. tested positive for illicit drugs and on many occasions tested negative for the prescribed controlled drugs.   Despite knowing B.R. was testing positive for illicit drugs and negative for the prescribed controlled substances, Dr. Librach continued to write controlled substance prescriptions for B.R.

86.   From in or about October 2016, to in or about January 2018, Dr. Ali wrote over 50 controlled substance prescriptions for Patient B.R., but according to B.R.'s medical record, Dr. Ali rarely if ever met B.R.   During this period, even though B.R. had a long history of testing inconsistently with B.R.'s controlled substance prescription regimen on urine drug

24

screens, and despite knowing B.R.'s history, Dr. Ali continued to write controlled substance

prescriptions for B.R.   Dr. Ali did so in the absence of meaningful medical decision-making.

Patient M.S.

87.    From in or about March 2016, to in or about October 2016, and from February

2018, to in or about April 2018, Dr. Librach wrote over 20 controlled substance prescriptions for

Patient M.S.   During this period, M.S. frequently tested inconsistently with M.S.'s controlled

substance prescription regimen, including by testing positive for illicit substances and negative

for M.S.'s prescribed controlled substances.   Despite knowing M.S. was not taking the

prescribed drugs, Dr. Librach continued to write controlled substance prescriptions for M.S.

88.    From in or about November 2016, to in or about January 2018, Dr. Ali wrote over

25 controlled substance prescriptions for M.S.   The medical chart of M.S. indicates that Dr. Ali

rarely saw M.S.   During this period, even though M.S. had a long history of testing

inconsistently with M.S.'s controlled substance prescription regimen, and despite knowing M.S.

had tested positive for illicit drugs and negative for the controlled substances prescribed, Dr. Ali

continued to write controlled substance prescriptions for M.S.

Patient C.D.

89.    From in or about April 2016, to in or about October 2016, and from in or about

February 2018, to in or about April 2018, Dr. Librach wrote over 15 controlled substance

prescriptions for Patient C.D.   According to C.D.'s medical file, Dr. Librach rarely if ever met

or evaluated C.D.   On several occasions, C.D. tested negative for the prescribed drugs and on

several occasions tested positive for illicit drugs and/or non-prescribed controlled substances.

Despite knowing C.D. was not taking the prescribed drugs or tested positive for illicit or non-

prescribed controlled substances drugs, Dr. Librach continued to write controlled substance prescriptions for C.D.

Patient D.M.

90.    From in or about August 2016, to in or about October 2016, and from in or about February 2018, to in or about April 2018, Dr. Librach wrote over 20 controlled substance prescriptions for Patient D.M.  D.M.'s medical file indicated Dr. Librach rarely if ever met or evaluated D.M.   Nonetheless, Dr. Librach continued to write controlled substance prescriptions for D.M.

Patient C.M.

91.    From in or about March 2017, to in or about January 2018, Dr. Ali wrote at least 12 controlled substance prescriptions for Patient C.M.   For this period, Dr. Ali rarely if ever saw or evaluated C.M.   To the extent any urine drug tests were ordered for C.M., Dr. Ali rarely if ever reviewed the results.   Despite this fact, Dr. Ali continued to write controlled substance prescriptions for C.M.

92.    On or about the dates listed below, in the Eastern District of Missouri and elsewhere,

ASIM MUHAMMAD ALI, M.D. and
STANLEY L. LIBRACH, M.D.,

the defendants herein, registrants under Title 21, United States Code, Sections 821 through 830, did knowingly and intentionally distribute and dispense, and cause to be distributed and dispensed, Schedule II controlled substances, outside the scope of professional practice and not for a legitimate medical purpose:

26

| Count | Patient | Date of Prescription | Controlled Substance | Doctor Prescribing |
|---|---|---|---|---|
| 2 | C.D. | 05/13/2016 | Oxycodone/APAP | Dr. Librach |
| 3 | D.M. | 09/29/2016 | Oxycodone/APAP Oxymorphone | Dr. Librach |
| 4 | C.M. | 08/18/2017 | Oxycodone HCL | Dr. Ali |
| 5 | B.R. | 07/29/2016 | Oxycodone HCL OxyContin | Dr. Librach |
| 6 | B.R. | 05/02/2017 | Oxycodone HCL | Dr. Ali |
| 7 | M.S. | 03/06/2017 | Oxycodone/APAP | Dr. Ali |
| 8 | M.S. | 02/26/2018 | Oxycodone/APAP | Dr. Librach |
| 9 | M.T. | 04/17/2016 | Oxycodone HCL Fentanyl MCG/HR | Dr. Librach |
| 10 | M.T. | 11/22/2017 | Oxycodone/APAP | Dr. Ali |

All in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## Counts 11 to 20
### Obtaining Controlled Substance by Fraud, Deception, or Subterfuge
### 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2

93.    Paragraphs 1 to 36, 40 to 81, and 83 to 91 are incorporated by reference as if fully set out herein.

94.    On or about June 15, 2016, E. Spates caused fraudulent prescription (211305) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at St. Louis Hills Pharmacy. The prescription bore the name of E. Spates and listed the prescribing doctor as Dr. Librach.

95.    On or about August 22, 2016, T. Spates and Price caused a fraudulent prescription (#29983) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at Olive Street Pharmacy.   The prescription bore the name of Patient D.P. and listed the prescribing doctor as Dr. Librach.

96.    On or about February 28, 2017, Herman caused two fraudulent prescriptions, one

27

(#42061) for oxycodone Hcl 30mg, 90 count tablets, and one (#42062) for phentermine 37.5 mg, 30 count tablets, to be filled at Olive Street Pharmacy. Erin Herman was listed as the patient and Dr. Librach was listed as the prescribing doctor. When Herman presented the prescriptions and received the oxycodone and phentermine tablets from the pharmacy, she knew the prescriptions were fraudulent.

97.    On or about May 22, 2017, Price caused a fraudulent prescription (#4525370) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at Walgreens Pharmacy, located at 9285 Halls Ferry Rd., Jennings, Missouri. The prescription listed M.R. as the patient and listed Dr. Librach as the prescribing doctor.

98.    On or about July 27, 2017, Price caused a fraudulent prescription (#4521559) for 30 mg oxycodone HCL, 120 count, tablets to be filled at Walgreens Pharmacy, 4218 Lindell Blvd., St. Louis, MO. The prescription listed J.S. as the patient and listed Dr. Librach as the prescribing doctor.

99.    On or about August 7, 2017, Price caused a fraudulent prescription (#4557455) for 30 mg oxycodone HCL, 90 count, tablets to be filled at Walgreens Pharmacy, 9285 Halls Ferry Rd., Jennings, MO. The prescription listed G.B. as the patient and listed the prescribing doctor as Dr. Librach.

100.    On or about September 22, 2017, Price caused a fraudulent prescription (#2221613) for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at Walgreens Pharmacy, 10500 St. Charles Rock Rd., St. Louis, MO, #15941. The prescription bore the name of Patient T.A. and listed the prescribing doctor as Dr. Librach.

101.    On or about November 7, 2017, Price caused a fraudulent prescription (#2059691)

28

for 10/325 mg oxycodone/acetaminophen, 120 count, tablets to be filled at SSM Health

Pharmacy, 12266 De Paul Dr., Ste. 105, Bridgeton, MO.   The prescription bore the name of

Patient F.E. and listed the prescribing doctor as Dr. Librach.

102.    On or about January 26, 2018, Crosby caused a fraudulent prescription (#253420)

for 10/325 mg oxycodone/acetaminophen, 120 count, to be filled at the CVS pharmacy in

Florissant.   The prescription bore the name of Shaunta Crosby and listed the prescribing doctor

as Dr. Librach.

103.    On or about May 14, 2018, Crosby caused a fraudulent prescription (#2220453)

for 10/325 mg oxycodone/acetaminophen, 120 count, to be filled at a Walgreens pharmacy in

Ferguson.   The prescription bore the name of J.F. and listed the prescribing doctor as

Dr. Librach.

104.    When the prescriptions, listed in paragraphs 94 through 103 above, were

presented to the pharmacies and controlled substances were received from the pharmacies, the

aforementioned defendants and co-conspirators knew the prescriptions were fraudulent.

105.    On or about the dates listed below, in the Eastern District of Missouri,

ASIM MUHAMMAD ALI, M.D., and
STANLEY L. LIBRACH, M.D.,

the defendants herein, did knowingly and intentionally acquire and obtain possession of a

controlled substance, to wit:   Oxycodone, a Schedule II controlled substance, by

misrepresentation, fraud, forgery, deception, and subterfuge:

29

| Count | Patient | Date Prescription Written | Date Prescription Filled | Controlled Substance | Doctor Listed on Prescription |
|---|---|---|---|---|---|
| 11 | Erica Spates | 06/01/2016 | 06/15/2016 | Oxycodone/APAP | Dr. Librach |
| 12 | D.P. | 08/17/2016 | 08/22/2016 | Oxycodone/APAP | Dr. Librach |
| 13 | M.R. | 05/18/2017 | 05/22/2017 | Oxycodone/APAP | Dr. Librach |
| 14 | J.S. | 07/13/2017 | 07/27/2017 | Oxycodone/HCL | Dr. Librach |
| 15 | G.B. | 08/03/2017 | 08/07/2017 | Oxycodone/HCL | Dr. Librach |
| 16 | T.A. | 09/14/2017 | 09/22/2017 | Oxycodone/APAP | Dr. Librach |
| 17 | Erin Herman | 10/25/2017 | 10/26/2017 | Oxycodone/HCL | Dr. Librach |
| 18 | F.E. | 10/20/2017 | 11/07/2017 | Oxycodone/APAP | Dr. Librach |
| 19 | Shaunta Crosby | 01/25/2018 | 01/26/2018 | Oxycodone/APAP | Dr. Librach |
| 20 | J.F. | 05/08/2018 | 05/14/2018 | Oxycodone/APAP | Doctor #1 |

All in violation of Title 21, United States Code, Section 843(a)(3) and Title 18, United States Code, Section 2.

## Counts 21 to 26
## Illegal Kickbacks for Referrals
## 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. §2

106.     Paragraphs 1 to 36, 40 to 81, 83 to 91, and 94 to 104 are incorporated by reference as if fully set out herein.

107.     On or about the dates listed below, in the Eastern District of Missouri,

ASIM MUHAMMAD ALI, M.D.,

the defendant herein, did knowingly and willfully offer and pay remuneration, (including a kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to Mikhlin, Dr. Leech, Dr. Librach, Hydar, API, IPM, and Librach, LLC to induce them to purchase, lease, order, and arrange for and recommend the purchasing, leasing, and ordering, of a good and service, for which payment may be made in whole or in part under a federal health care program, that is, Dr. Ali and CDL paid Mikhlin, Dr. Leech, Dr. Librach, Hydar, API, IPM, and Librach, LLC on a per specimen basis for each urine specimen sent to CDL for testing:

| Count | Check Number | Date of Check | Amount of Check | Paid to | Payor |
|---|---|---|---|---|---|
| 21 | 2638 | 10/05/2016 | $14,595.00 | D. Mikhlin Enterprise | CDL |
| 22 | 2534 | 11/04/2016 | $12,110.00 | D. Mikhlin Enterprise | CDL |
| 23 | 2468 | 12/05/2016 | $12,565.00 | D. Mikhlin Enterprise | CDL |
| 24 | 3183 | 07/17/2017 | $ 1,200.00 | Sally Hydar | CDL |
| 25 | 3065 | 04/30/2017 | $ 7,840.00 | Midwest Marketing | CDL |
| 26 | 3551 | 01/05/2018 | $10,000.00 | Midwest Marketing | CDL |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

### Counts 27 to 35
### Illegal Kickbacks for Referrals
### 42 U.S.C. § 1320a-7b(b)(1)(B) and 18 U.S.C. § 2

108.    Paragraphs 1 to 36, 40 to 81, 83 to 91, and 94 to 104 are incorporated by reference as if fully set out herein.

109.    On or about the dates listed below, in the Eastern District of Missouri,

STANLEY L. LIBRACH, M.D., and
SALLY M. HYDAR,

the defendants herein, did knowingly and willfully solicit and receive remuneration, (including a kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, from Dr. Ali and CDL, to purchase, lease, order, and arrange for and recommend the purchasing, leasing, and ordering, of a good and service, for which payment may be made in whole or in part under a federal health care program, that is, Dr. Librach, Hydar, API, IPM, and Librach, LLC solicited and received remuneration from Dr. Ali and CDL on a per specimen basis for each urine specimen sent to CDL for testing.

31

| Count | Check Number | Date of Check | Amount of Check | Paid to | Payor |
|-------|--------------|---------------|-----------------|---------|-------|
| 27 | 2638 | 10/05/2016 | $14,595.00 | D. Mikhlin Enterprise | CDL |
| 28 | 2534 | 11/04/2016 | $12,110.00 | D. Mikhlin Enterprise | CDL |
| 29 | 2468 | 12/05/2016 | $12,565.00 | D. Mikhlin Enterprise | CDL |
| 30 | 3183 | 07/17/2017 | $ 1,200.00 | Sally Hydar | CDL |
| 31 | 3065 | 04/30/2017 | $ 7,840.00 | Midwest Marketing | CDL |
| 32 | 3551 | 01/05/2018 | $10,000.00 | Midwest Marketing | CDL |
| 33 | 3579 | 02/15/2018 | $900.00 | Sally Hydar | CDL |
| 34 | 3250 | 10/24/2017 | $1,200.00 | Sally Hydar | CDL |
| 35 | 3460 | 12/5/2017 | $1,200.00 | Sally Hydar | CDL |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B) and Title 18, United States Code, Section 2.

### Counts 36 to 43
### Health Care Fraud Scheme
### 18 U. S. C. §§ 1347 and 2

110.   Paragraphs 1 to 36, 40 to 81, 83 to 91, and 94 to 104 are incorporated by reference as if fully set out herein.

111.   On or about the dates listed below, in the Eastern District of Missouri,

ASIM MUHAMMAD ALI, M.D., and
STANLEY L. LIBRACH, M.D.,

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme or artifice to defraud Medicare and Missouri Medicaid, which are health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted, and caused to be submitted false reimbursement claims for services or items that they knew were not provided or were medically unnecessary.

32

| Count | Patient | Patient Service | Date of Claim | Date of Prescription | Insurer | Provider |
|-------|---------|-----------------|---------------|----------------------|---------|----------|
| 36 | T.A. | Script | 09/17/2015 | 09/17/2015 | Medicaid | Dr. Librach |
| 37 | H.B. | Script | 02/20/2016 | 02/17/2016 | Medicare | Dr. Librach |
| 38 | R.C. | Script | 01/17/2018 | 01/10/2018 | Medicaid | Dr. Ali |
| 39 | J.G. | Script | 03/04/2017 | 02/23/2017 | Medicare | Dr. Librach |
| 40 | A.H. | Script | 04/25/2017 | 04/13/2017 | Medicaid | Dr. Librach |
| 41 | K.H. | Script | 01/17/2018 | 01/09/2018 | Medicare | Dr. Ali |
| 42 | M.J. | Script | 11/03/2017 | 11/02/2017 | Medicaid | Dr. Ali |
| 43 | C.P. | Script | 08/11/2015 | 08/11/2015 | Medicaid | Dr. Librach |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## Count 44
## False Statements Relating to Health Care Matters
## 18 U.S.C. §§ 1035 and 2

112.     Paragraphs 1 to 36, 40 to 81, 83 to 91 and 94 to 104 are incorporated by reference as if fully set out herein.

113.     On or about the date indicated below, in the Eastern District of Missouri, the defendant,

SALLY M. HYDAR,

knowingly and willfully made and used materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services involving the Medicare program, a health care benefit program as defined in 18 U.S.C. § 24(b), in violation of 18 U.S.C. § 1035, in that the defendant falsely stated and represented on a urine drug screen result of a Librach, LLC patient that the patient had tested positive for an illicit substance, in order to justify to Medicare the medical necessity for that and subsequent urine drug screens for

the patient, when the defendant then and there well knew said statements and representations were false, fictitious, and fraudulent.

| COUNT | DATE OF OFFENSE | INITIALS OF PATIENT | HYDAR FALSE STATEMENT ON URINE DRUG SCREEN |
|-------|------------------|----------------------|---------------------------------------------|
| 44 | March 26, 2018 | J.O. | Changed result for hydromorphone from negative to positive |

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1.     Pursuant to Title 21, United States Code, Section 853(a), upon conviction of an offense in violation of Title 21, United States Code, Sections 841(a)(1) or 843(a)(3), including conspiracy to commit such offense, as set forth in Counts 1 through 20, the defendant(s) shall forfeit to the United States of America any property, constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation(s) and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation(s).   Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds obtained directly or indirectly as a result of such violation(s).

2.     Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of an offense in violation of Title 42, United States Code, Section 1320a-7b or Title 18, United States Code, Section 1347, including conspiracy to commit such offenses, as set forth in Counts 1, and 21 through 43, the defendant(s) shall forfeit to the United States of America any property,

34

real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.   Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

      3.      Pursuant to Title 18, United States Code, Sections 982(a)(2)(b) and 1028(b), upon conviction of a conspiracy to violate Title 18, United States Code, Section 1028 as set forth in Count 1, the defendant(s) shall forfeit to the United States of America any property constituting, or derived from, proceeds the defendant(s) obtained, directly or indirectly, as a result of such violation and any personal property used or intended to be used to commit said offense.   Subject to forfeiture is a sum of money equal to the total value of the property constituting, or derived from, proceeds the defendant(s) obtained directly or indirectly, as a result of such violation.

      4.      If any of the property described above, as a result of any act or omission of the defendant(s):

            a.      cannot be located upon the exercise of due diligence;

            b.      has been transferred or sold to, or deposited with, a third party;

            c.      has been placed beyond the jurisdiction of the court;

            d.      has been substantially diminished in value; or

            e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____

FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____

AMY E. SESTRIC, #66219MO
Assistant United States Attorney

36